## Poetter v. Poetter.

March 24, 1939.

Churchill Humphrey, Judge.

J. W. CLEMENTS for appellant.

L. R. CURTIS and CURTIS & CURTIS for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—
Partly affirmed and partly reversed.

The appellant, H. J. Poetter, 77 years of age, instituted this suit in the chancery branch of the Jefferson Circuit Court against his son, R. J. Poetter, 44 years of age, seeking an accounting on numerous business transactions and personal matters between them covering a period of about eight years. In this opinion we will refer to the appellant as the plaintiff and to the appellee as the defendant.

The wife of the plaintiff, and mother of the defendant, died in 1928, but the father and son continued to maintain their home in the house the defendant had bought several years previous to his mother's death, and upon which he owed considerable money to the Louisville Trust Company and to the Southern Trust Company. The father owned most of the furniture and household effects and appears to have been interested in cooking. He had a federal pension of $100 per month as a retired postal employee, and earned a salary of $80 per month from a position he held with the Standard Oil Company. Defendant worked for the same company at a salary of $145 per month, which was all the income he had. In the fall of 1932 the son married but this does not appear to have affected the living arrangements existing between his father and him, although for some reason not shown in the record, the father left the son's home in 1936. Soon thereafter he demanded from his son a settlement of accounts existing between them from 1928 up until April 1, 1936, and instituted this suit May 21, 1936, for such an accounting.

Both the father and son had made some investments in the stock market and when the crash came in 1929, the son experienced some financial difficulty. His father came to his rescue and made twenty-one monthly payments of $52.20 each, on the house from July 3, 1930, to April 4, 1932, aggregating $1,096.20; and eighteen monthly payments of $40 each, and six of $30

each, on the house from April 1, 1932, to April 1, 1934, aggregating $900. In addition to this the father had certain repairs and improvements made on the house; loaned his son stocks to be put up with his brokers as collateral; made innumerable small loans to his son, and several loans for material amounts. No records were kept of these transactions, and to further confuse matters, the parties had exchanged checks. The father would give his son his checks which were at the time good at the bank, while the son would execute his checks for the same amounts to his father, with the understanding his father would hold them until the son had sufficient cash in the bank to meet these checks. Of the great number of checks passing between the parties, very few show for what they were given. Many of them are in the form of "counter checks," which are only receipts showing the bank had delivered to the maker the amount of cash shown on the "counter check." Also, there were purchases of groceries and house-hold supplies by the father and by the son, and they are involved in this suit.

After the pleadings were made up an order was entered referring the case to Hon. Charles T. Ray, Commissioner, to hear proof and make a report on twenty different items, ranging in amounts from $5 to $1,500. After hearing the proof, with which a large number of exhibits were filed, the commissioner made a full and complete report of seventeen pages in which he gave his ruling on each item submitted to him and he found a balance in favor of the plaintiff of $572.45. Both plaintiff and defendant filed exceptions to adverse rulings by the commissioner which brought the report before the chancellor. All exceptions were overruled by the chancellor and judgment was entered in conformity with the commissioner's report, and the chancellor adjudged each party should pay his own cost and one-half of the allowance made to the commissioner. From this judgment the plaintiff appeals but the defendant prosecutes no cross appeal.

This appeal brings before us eight items to pass upon, and since there is no law involved in any of them, with the exception of the first and last items, we will attempt to be brief in giving the reasons supporting our conclusions. To go minutely into the pleadings, the proof and exhibits on each item would extend the opinion to an unreasonable length.

1. Plaintiff contends there is neither pleading nor proof to support the item for board of $1,920 the commissioner found against him and he relies upon Section 2178, Kentucky Statutes, known as the "Hospitality Act," and the cases construing it, to defeat defendant's claim for board and lodging furnished him. By this pleading, plaintiff admits he is indebted to his son in the sum of $450, which represents board at $15 per month for a period of 30 months, and his son pleaded an express contract wherein it was mutually agreed the board was to be furnished at $52.20 per month and at a later date, they mutually agreed the price of the board should be reduced to $40 per month. Each party supported his pleading by proof and such pleading and proof take the question of board out of the "Hospitality Act." The finding of the commissioner fixing the amount the father owed the son for board at $1,920 was approved by the chancellor and will not be disturbed.

2. It is argued by plaintiff the $1,000 check given him by his son on October 31, 1929, was not a payment on the son's indebtedness, but was an exchange of checks between him and his son. The record shows the son sold some American Radiator stock September 6, 1929, for $5,241, and on October 31, 1929, he bought 75 shares of Atlantic Refining Company stock at $45 which with the expenses and commissions came to $3,386.25, so it is seen he would have had $1,000 to pay this check to his father dated October 31, 1929. If this transaction were an exchange of checks between father and son, as the father contends, and was not a payment by the son to his father on his indebtedness, then the father's bank account would show a debit on, or soon after, October 31, 1929, of $1,000. The testimony of Miss Edna Highland, bookkeeper in the First National Bank, is that the plaintiff's bank account showed no such debit. Therefore, the chancellor was correct on this item.

3. There were a large number of "counter checks," the record shows 61 of them, representing various small amounts aggregating $240, which the son claimed were paid by him as a credit on the indebtedness owed his father. The commissioner reluctantly allowed $180 of these checks as a credit, and held the balance of $60 was not paid by the son to the father. The evidence is very conflicting on this item—the father testifying he

never received the money and the son testifying that it was paid to his father. Our mind is left in a state of doubt, therefore, we affirm the commissioner and chancellor on this item.

4. Plaintiff testified the three checks of $100 each executed to him by his son March 28, 1930, March 3, 1931, and January 24, 1933, respectively, were an exchange of checks between him and his son. But the testimony of Miss Highland, bookkeeper in the First National Bank, shows there was no credit to the son's account and no charge against the father's account of $100 around March 3, 1931, although there was a credit to the father's account of $100 on March 5, 1931. Miss Highland testified the son's account was credited by $100 on February 4, 1930, and on this same date the father's account was charged with $100, but this was more than a month before the check of March 28, 1930, was given. On January 23, 1933, the son's account was credited with $100, but Miss Highland did not have the father's account for 1933 as it appears his account was closed in 1932. Upon such evidence we are not prepared to say the commissioner and the chancellor were in error in crediting the son with these three $100 checks as there is no proof they were exchange checks.

5. There were twelve checks aggregating $281.50, executed by the son to his father which the son did not claim were paid by him on the indebtedness due his father. Defendant testified he filed these as exhibits "just to show he paid back what he borrowed" from his father. Under such testimony he should not have been given credit for these checks. We presume the error made by the commissioner and the chancellor in allowing the son credit for same was an oversight caused by the great number of exhibits filed in the record.

6. There is but little controversy concerning the 35 shares of Standard Oil of Kentucky Stock. The father was willing to credit the son with this stock at $16 per share, while the son claimed it should be credited at $17.00 per share. Plaintiff contends that although there was no evidence the stock was worth $17 per share, yet the commissioner credited it at this figure. However, the total credit given by the commissioner on this item is $525, and the 35 shares at $16 per share amount to $560, thus we see, due to a mistake in calculation, the commissioner fell short $35 in his credit to the son on

this item. As the son prosecutes no cross appeal and is not complaining in his brief of this mistake, we will not disturb it.

7. We agree with the commissioner and the chancellor that the 20 shares of Atlantic Refining Company stock, although bought and sold in the name of the son, were pledged as collateral on the father's note at the First National Bank, and Hilliard & Company, brokers, delivered the check to the bank and took up the stock. The son owed the bank nothing and it is clear the proceeds from this stock were applied on the father's note.

8. On the record before us we do not feel justified in disturbing the finding of the commissioner, which was approved by the chancellor, in disallowing the plaintiff's claim for $25 for repairs to the furnace in his son's house.

The chancellor adjudged plaintiff should recover $572.45 from his son and that each party should pay his own cost and one-half of the allowance made to the commissioner. The only error we find after a careful review of the record is the chancellor should not have allowed the son credit for $281.50 on the item of twelve checks discussed by us under the fifth heading, and this added to the $572.45, makes the correct sum due the father $853.95.

Plaintiff excepted to the ruling of the chancellor that each party should pay his own cost and one half of the fee allowed the commissioner. It is his contention that under Section 889 of Kentucky Statutes, the party succeeding on the merits in an equity suit should recover his costs. He relies on Darby v. Van Meter, 155 Ky. 462, 159 S. W. 940; Mori v. Howard, 143 Ky. 480, 136 S. W. 904; Shannon v. Stratton & Terstegge, 144 Ky. 26, 137 S .W. 850, and Lykins v. Hamrick, 144 Ky. 80, 137 S. W. 852. An examination of these cases shows we held that where plaintiff recovers any part of the sum sued for he should have judgment for cost. But the case at bar contains numerous items, extending over a period of eight years, and it was impossible for either party to know just where he stood without such a suit, and it was necessary for their accounts to be submitted to a commissioner to unravel them. This case is very similar to Nevian v. New Albany Ice Company, 68 S. W. 647, 649, 24 Ky. Law Rep. 400, where the court said:

"We conclude also that the cost of the commissioner and expert should be paid in equal portions by the plaintiff and defendant. This is a settlement of many accounts, and the services of an expert were required to aid the court by reason of the way the accounts were kept. This was the fault of one side probably as much as the other."

The chancellor was correct in adjudging each party should pay his own costs, including one-half of the commissioner's fee. As the chancellor erred in allowing defendant a credit of $281.50 and in entering judgment for plaintiff for only $572.45, we reverse this part of the judgment and direct a judgment to be entered for plaintiff in the sum of $853.95. In all other particulars the judgment is affirmed.

Whole Court sitting.